Here ye, here ye, this Honorable Appellate Court for the 2nd District is now open. The Honorable Justice Susan Hutchinson presiding, along with Justice Ann Jorgensen and Justice Mary Shostak. The case is No. 2-19-09-59, Lance Pacernick, Plaintiff Appellant v. Board of Education of Waukegan Community Unit School District No. 60, Defendant Appellee. Arguing for the appellant, Stephen P. Blonder. Arguing for the appellee, Linda K. Horace. Hi, good morning, counsel, and sorry for the delay. We've had some technical difficulties with our equipment today, and that often happens. And then we had some technical equipment with counsel's equipment earlier. So if you are ready to proceed, Mr. Blonder, you may do so. Thank you, Your Honor. May it please the Court. My name is Stephen Blonder, and I represent Lance Pacernick, the Appellant, for this matter. And I'm standing before you today asking that you reverse the termination and give him his job back. This is a case that essentially deals with the power of a school board, and the limitations of that power is reflected in the Teacher Tenure Act and the Administrative Code. We submit that the board did not follow the applicable procedures, did not follow the applicable law in terminating Mr. Pacernick. The facts in this case are largely not disputed. Nor is the law. It's a body of law that we're each talking about that gives bedrock principles and falls to that. It's undisputed here, Mr. Pacernick had been a teacher for 15 years in the district, and he had never received a remediation notice for any conduct, including that the board cited when it fired him. Undisputed that Mr. Pacernick never had sex with any student or approached any student for sex. He never threatened any student. No student avoided Mr. Pacernick or refused to travel to track meets with him or left the track team because of anything he said or did. There's no evidence that any student was significantly harmed by anything Mr. Pacernick said or did. No expert opined that Mr. Pacernick's conduct or remarks harmed students in ways they were not aware of. Mr. Pacernick was always evaluated every two years at least seven times as a competent teacher. DCFS investigated twice at the school board's urging and determined that claims of abuse against Mr. Pacernick were unwarranted. The Waukegan Police Department did the same, investigating and determining that criminal charges against Mr. Pacernick were unwarranted. We don't dispute that Mr. Pacernick in his two years as a coach may have said things that students found inappropriate or insensitive, but such behavior can be corrected with remediation notice. Here, the school board and the school district decided they wanted to get rid of Mr. Pacernick for whatever their reason, and they did so. They did so, however, by summarily firing him on May 9th. In doing so, they relied on an executive summary that was prepared, which contained things that weren't even relevant, weren't even part of the administrative hearing process. So the superintendent presented that executive summary to the board without talking to the teacher, without talking to any student, without talking to any witness. This was a rush to judgment. And in doing so, what the district has done is taken a 15-year teacher and well-regarded coach and characterized him as immoral, a The Teacher Tenure Act protects teachers from arbitrarily being fired or terminated. Here, that's exactly what the district did. The board overreacted by dismissing Mr. Pacernick and didn't comply with the school code in doing so, and in doing so, exceeded its power in doing whatever it wanted to do. There are two paths here that the case law lays out. Gill Land is the seminal case, and basically, it looks, it's a two-prong analysis, and it says, a cause of resulting dismissal is irremediable. What damage has been done to the students, the faculty, the school itself, and the damage could not have been corrected, even if warnings had been given by the teacher superiors to the effect that if the causes were not corrected, charges would be brought seeking the teachers' dismissal. So here, it's undisputed that Mr. Pacernick had not been given the written warning that's provided. It's undisputed. Second, it's undisputed that at the testimony, there was no harm or damage to students. It wasn't proven. Ms. Horace actually argued in the trial court that the harm for one of the students, I'll call her SW, was a perceived poor performance at one track and field meet. The parents, though, testified that any conduct was not a cause for concern. No psychologist testified, no adult testified to any change in any student athlete's demeanor or behavior. There's no basis in the record for any harm here that was claimed was harms to the school. But that was self-imposed because it's solely based on a Chicago Tribune article for which the school district released the summary of charges to the newspaper. They weren't required to do so, but they did nonetheless. And that's the sole source that was identified of any harm to the district. So in that sense, it's circular. The district puts the information out there and then claims harm. Here, Mr. Pasternak, so the question is, did they comply with Gilleland? No. Instead, what they do is they say the conduct was immoral and there was no need to give the written warning. But the cases that talk about that talk about the commission of a crime, i.e. stealing, identity fraud, etc., or they talk about sexual touching, sexual fondling, or other aspects of inappropriate behavior, which would be criminal day in and day out. Again, the record is undisputed that those things didn't happen here. So taken full circle, the harm that the superintendent talked about, which is the testimony of harm, which leads to the immoral conduct is that students may have not complained or said anything because that's the way either Black students or Hispanic students, particularly girls, are trained to be. That's basically an appeal to racism as a way to justify immoral conduct. And there's no suggestion that anything that Mr. Pasternak did was racially motivated, racially driven, or contained any racial epithet in any way, shape, or form. So what we're left with is a 15-year teacher who had always been well regarded, who was summarily dismissed. The other piece that's interesting is in the hearing officer's report, she references a situation from approximately five years before when someone a team lead had told Mr. Pasternak, hey, just be careful, people perceive you as a close talker. But if you're going to focus on that, A, you get into like Russell, which says you can't look at a five-year-old incident for which, in that case, something had been expunged. Here there was no written warning as required by the school code. But then again, the hearing officer then says, well, it was irremediable behavior. If they truly believed that, they wouldn't have focused on the incident from five years before. The school district is trying to have it both ways. On the one hand, they try to get to conduct and say Mr. Pasternak was warned. And then they say, no, they didn't have to warn him because he was immoral. Under either of those paths, the school district's argument fails. I'm happy to answer any questions the panel may have. Thank you, sir. And Justice Jorgensen, do you have any questions?  ≫ Thank you. ≫ What remediation would you suggest should have been done? ≫ So a couple of things. Number one, they could have said to Mr. Pasternak, you're a close talker, be aware of space, and given him a written notice and said, okay, revisit it in six months. Do students feel uncomfortable? Is he doing something wrong? And then the second thing, they could have given him mediation saying, be careful with the comments that you're making on the track field, because students find it inappropriate, and then come back and say, okay, did he say anything or do anything in the next six months that caused an issue? Again, it's six months, three months, a year. Third, they could have said, taken away his coaching. All of the instances that are pointed to here happened in coaching. Nothing happened in this classroom at all. So that could have been a third way to deal with it. So those are three examples of ways that this could have been remediated. Fourth, actually, would have been with respect to the harm, asking to actually give a written apology to the students for insensitive comments and take it from there. So that would be what I would suggest would be methods of remediation. ≫ But you left out the the fact that he keeps touching these girls. ≫ So there is, I'm sorry, I thought I addressed that. It could be part of it is, do not for any purpose, for any reason, touch any student. And again, the touchings that were led, for one, with a program after a race, where he kind of went to kind of say, hey, good job, where it touched a student on the back. The other one was that he had his whistle and kind of his lanyard kind of and was twirling it around. So again, it could have been, Mr. Paschenek, under no circumstances can you in any way come within a foot of a student or touch a student for any purpose. ≫ And your position is the school is responsible for its own harm? ≫ Yes, our position is the school is responsible for its harm here to the extent they're saying that the harm comes from the newspaper article, which is what they cited. ≫ So you think that because they were the one that put out the press release, had they not and simply put a cork in this bottle, then no harm, no foul? ≫ It would have been no harm. And so when you look under the Gillibrand test, they would not have been able to support what they did. ≫ All right. I have no further questions. ≫ Thank you, Justice Jorgensen. Justice Shostak. ≫ So do they really have to be that specific? You just answered a question from Justice Jorgensen with respect to the notice that they would have had given him previously. Do they really have to be that specific and say you can't touch kids, you can't, you know, blah, blah, blah? I mean, look at your school policy, 4306, 4002, and 6021. How much more specific can they be? And did he not violate those? How did he not violate those? ≫ Even if he violated the policies, simply violated ≫ You're saying the procedure didn't ≫ Defective. Simply violating a school policy is not grounds in of itself for professional capital punishment. So it's that in of itself, you still have to go through the harm. And the question is, is it remediable? I mean, take the example of the case where the teacher with the lesson plans and other things, and they said, no, you have to give them the warning, even though it was part of the school policy, you give the warning, and then the warning has to be written, and then if they don't comply, then you can terminate them. But there's a procedure here that's required for a reason. They didn't follow it. ≫ And whose decision are we reviewing here, and what is the standard of review? ≫ So we're reviewing the board's decision, ultimately. And it's a manifest way of the evidence standard, because it's a mixed question of law and fact. So I'm looking at it. Now, the question is, did the board act arbitrarily in acting? But that being said, they have to have followed the proper procedures. ≫ Well, if they felt he was irremediable based upon their prior conversation with him, then no written warning would be required, correct? ≫ No, because if it's based on the prior, that puts you in the case of Russell. And again, here, they didn't have a prior conversation with him. He'd never been brought before the board before, and he'd never been brought there. ≫ Would he have to be brought before the board? In order to have a prior notice, he would have been brought before the board? ≫ No, not necessarily. But here, there was no prior notice to him of anything. ≫ Okay. I have no further questions. Wait one second. No, I'm good. Thank you. ≫ Thank you, Justice Shostak. Mr. Blonder, wasn't there some conversation at a previous time involving a student and a pencil in his classroom? Yes, that was the incident roughly five years before, for which it was deemed unfounded. ≫ But unfounded is not the same, that is not the definition, or is that part of the school regs? It doesn't say if it's unfounded, it's okay. There are specific definitions, maybe not in the regs, but certainly within case law that's based upon similar regulations, talking about what is not appropriate conduct. And so, if someone talked to him and said, look, you know, this isn't a good idea, you shouldn't do that in your classroom or otherwise, why should we just forget that that happened? ≫ Because number one, it was deemed unfounded. Number two, the school code provides for written notice, if it's going to be the basis for termination. That makes, to me, your honor, the case like Russell, where it was something from years before, it was expunged, and then the school board tried to use it as justification, saying there was a prior warning, such to terminate the teacher. Here, the school board takes the position, Mr. Pashnik was immoral, and it did not need to give any notice of remediation, because the conduct was pure remediable. And so, they didn't even go down that path. They took a different approach, specifically rejecting the concept that this was remediable conduct. ≫ All right. There really is no statutory definition of immoral or immorality in the law or in the regulations, or is there? ≫ No, there's not, your honor. ≫ And so, this would be a basic subjective, I guess, decision by those in the place of responsibility, the school board, or the administrators reporting to the school board, correct? ≫ Well, you would look at it through that lens. However, we have case law that basically guides us as to when conduct is remediable and when it's not. ≫ Didn't they, didn't someone, and I beg your pardon, I've forgotten whom, but didn't your client have conversations on three occasions where his union representative was with him, with someone affiliated with Waukegan High School? ≫ Are you talking about in connection with the termination? ≫ Well, as this process and the interview of the girls was taking place, wasn't he, didn't he have an opportunity to talk with someone from the administration about this? ≫ I believe there was at least, there was one meeting, but at that meeting, they didn't give him any of the charges against him. ≫ All right. But at some meeting, even, you know, as you're saying, not written notice, they did give him that information, didn't they? ≫ No. What they did was there was the executive summary that was presented to the school board, then there was bill particulars, which was different in the administrative hearing. ≫ Did he ever deny to the people that he talked to, at least on that one occasion, that, you know, nothing, there's no problem, nothing's happened? ≫ No, he doesn't, he has never denied that he made the comments that were attributed to him. They need to be looked at in context. But he has never, again, he's not contesting here that he may have said things that were inappropriate. ≫ Doesn't the issue of immorality have to be taken not only in the context of the regulations, but in the context of what's happening in the world related to these types of activities? ≫ It needs to be taken in context, and you're right, Your Honor, it's in context of what's happening in school district, what's happening in case law. And again, here, there was no criminal conduct. People who looked into it all said no. Looked at it in context, yes, he made a couple of inappropriate comments, and he had inappropriate touching, if you call it that, which was, again, not sexual in any way, and was in context of coaching, and even the student who were involved said that training would have made them aware that this was remediable. Again, the students who actually testified at the hearing recognized that, yeah, maybe it wasn't quite right, but it didn't rise to the level of immoral conduct. ≫ Didn't most of the students who testified say that they felt uncomfortable, but they, when cross-examined, said they didn't quit track because it's what they love and it's what they do? ≫ Some of them said that, and some of them said that Mr. Pasternak was a good coach, that he didn't deserve to be fired, and training would have made him aware that his actions caused girls to feel uncomfortable. They went to him for recommendations, which he gave them, for college, for jobs. They went with him overnight to meets and other things, and they generally all said he was a very good coach. The most interesting thing for me on this, Your Honor, is the assistant coach, Christine Zucker, who testified that she didn't see him do anything, and that when they raised it with her, the student SW, that Mr. Pasternak had touched her inappropriately, she didn't report it, and if it was something inappropriate or so immoral, she should have reported it. She's a mandated reporter under the state, and she never did. If you look at it in context, at the time, she didn't even think it was anything immoral, and she was the first one on the scene and had the best view of it, because she was the one the students talked to. ≫ Because there are so many young women involved in basically initials, I apologize for not knowing the precise young woman who said this, but one of them said that they didn't report it because somebody else had reported something and nothing had happened. I think it was Mr. Taylor. ≫ Mr. Taylor, I think it was the athletic director. It was Christine Zucker who is the one with the assistant coach who they brought it to. ≫ Okay, but on the first instance ≫ I believe Mr. Taylor said it was never, correct me if I'm wrong, I apologize. My recollection of the record was that Mr. Taylor said it was never reported to him. ≫ I think that's what you said, but I think one of the girls did report that there had been a report to Mr. Taylor and nothing happened, so it kind of got around the squad that there's no point in reporting these things. ≫ Again, I don't remember the exact testimony. I just remember Mr. Taylor saying it hadn't been reported to him. ≫ All right. Thank you very much, Mr. Blunder. Do either of my colleagues have any questions based upon mine? ≫ No. ≫ I have one quick question. You mentioned that even the police officers didn't feel that there was a criminal case and DCFS didn't feel there was a case that should have been indicated. Aren't the standards of review and the burden of proof much different on a criminal case and a DCFS finding? ≫ Of course they are, but it goes to a basis of that everyone who looked at it in that sense deemed it not worth pursuing. ≫ Okay. Thanks. ≫ Okay. Thank you. Council, you will have an opportunity to reply if you choose after Ms. Horace goes forward, and are you ready to do that, ma'am? I lost her. ≫ Hold on, judge. ≫ Yeah, I'm just on mute. ≫ On mute? ≫ We can go back to the report. Thank you. ≫ Okay. Go ahead. ≫ All right. Good morning. My name is Linda and I'm a teacher. I'm a teacher. I'm a teacher at its core. The question of what it is to be a teacher, it is certainly more than teaching a reading or writing class. Our teachers have to be role models, both to girls and boys that are under his tutelage. This case is not now and it has never been a case involving remediable conduct. The case law is clear. Remediable conduct cases are typically those types of cases of teachers implementing teaching plans. What's going on in the classroom? This, however, is irremediable conduct, as evidenced by how the appellant treated these teenage girls for at least two track seasons. Teachers are our children's role models. We entrust our children from a young age to adulthood, and these teachers must exemplify the qualities we want in our next generation, which has nothing to do with teaching English literature. So what it comes down to is this case is all about qualities of respect, responsibility, and citizenship, those qualities that a teacher has and demonstrates to others, including students, peers, parents, and the community. So I believe that this case is not about the classroom. It's all about character. And if the teacher lacks that inherent good character that is essential to be a role model, then it really doesn't matter how good he teaches. And the school code embodies that, that says that a board is entitled to remove a teacher who engages in acts of cruelty, negligence, immorality, or other sufficient cause. And while that term immorality is not defined in the code, the case law does define it, and it's looked at as under its ordinary and common meaning. Immorality is the immoral indifference to what members of the society would hold as good and respectable. So in the decision before you, we look first to say, what did the hearing officer do on findings of fact? Did the board prove that Mr. Pasternak had engaged in this behavior? And the hearing officer was the person who sat just feet away from these girls. She heard them using their teenage words and their teenage status to express what had happened to them and how they felt about it. She heard their testimony. She received the evidence. She determined their credibility and gave weight to that testimony. And she found that the board had proven four categories of misconduct, that the invasion of personal space, the physical contact, the ongoing crude comments and leering at these girls. For example, the strange comment about use the junk in your trunk or to BS one of these young girls who had a medical condition. And his response was to turn to her and say, are you pregnant? And then laugh at her. Encouraging the girls to run in sports bras. Asking SW and another girl at dinner, did they want to take a picture of his pickle? And there's plenty more that's in the record. And in short, this man treated these girls because they were girls. Because of and based on their sex. And the hearing officer found that the board had proven that Mr. Pasternak had engaged in that on a manifest way of the evidence standard when we review them on appeal. And that is, is an opposite conclusion clearly evident? And that's not the case here. So then we look to the second question. And that's the issue of irremediability. Did the board prove that this conduct was irremediable? And as Mr. Blonder mentioned, there's two factors here. Did it damage students, faculty or school? And could that behavior had been corrected with a warning? And on the issue of damages, the board clearly proved it. Girl after girl testified about how this man made them feel. Granted, they used teenage words to express themselves. It was creepy. It was weird. It was odd. It made me feel strange. They also used the word inappropriate. One girl testified that it made her feel like he was looking at the girls in a different, incorrect manner. And that's a quote. A number of the girls said it made them uncomfortable. But there's more than that. SW would not go to a sports clinic unless another girl went. She was so upset after he touched her on the buttocks that she did not do good in her event. She quoted, and another quote here, I was in shock. And she ultimately had to quit. Her dad said, I'm not letting you go back there until he's removed as the coach. BS testified that she changed the way she dressed around him. And she was very distraught when she confided in him on a personal medical problem. And he showed no regard for her as a person. One of the girls said she was so embarrassed she wouldn't tell her parents. While two said they were so angry that they did not tell their parents. And then there was testimony about the adult factor that we don't know if we should say anything. SW feared retaliation. One of the girls did say, you know what, BS already reported it to Mr. Taylor. We don't think anything can be done. And long-time educator, the superintendent testified that she believed in her experience that it took a great amount of Now, with regard to the local news sources, I want to be clear on this point. Those news articles were introduced into the record via stipulation. There is no testimony in the record as to how that information got to the news. It is very possible that they were FOIAed. There's local reporters that go to those hearings. So it's absolutely incorrect for any decision to be made based on this that the board fed this information to the papers. That is simply not in the record. So ultimately, did those articles cause harm? Sure, it did. Superintendent Plasencia said that those articles and the related Facebook chatter damaged the school's reputation. Beatrice Jones, one of the legal guardians, said, you know, it's really bad when these types of things are So next we turn to the second Gillian factor, and that is, would this conduct have changed had this man been warned? And the hearing officer did note he had been counseled about the need for spatial awareness back in 2012. BS told him in 2015, do not touch me. And her mom delivered a stinging rebuke to this man at a parent meeting, telling him you need to treat these girls with respect. And yet that disrespectful sexist treatment of this girl of these girls continued. The hearing officer held that it was irremediable and the board adopted that decision. Mr. Blunder is right. There are a number of cases that deal with irremediable conduct. However, it's not simply limited to conduct that is criminal or that is sexual assault. It's much broader than that. For example, in Rolando, the teacher used a cattle prod and a coward's list to discipline his students. That was irremediable. In Ahmaud, the teacher misrepresented herself as a person from Chicago Public Schools in order to acquire supplies that she sold in her business. Payne involved a teacher who was convicted of pot possession. But perhaps more on point is the case of Hunt. You know what? I jumped McBroom. McBroom is key here because it's a second district case. That was one instance of a teacher taking an endorsed check and cashing it herself. That was deemed to be irremediable. There was no way this teacher could continue to be a role model after engaging in that one instance. So now let me turn to Hunt, which is probably more factually on point here. It was a long time gym teacher and three second grade girls reported that Hunt pulled them by the shoulders and pinched them on the butt. While the hearing officer surprisingly found against the school on appeal, both to the trial court and the appellate court, the courts disagreed, finding that this conduct was distinguishable from those types of remediable discharge cases that often go to teacher performance or corporal punishment. This was a situation involving immoral conduct. It has no legitimate basis in school policy. And it didn't need to have a sexual component to it to be irremediable and be immoral. In all of these cases have the common denominator of an inherent human trait that these teachers lacked. Poor judgment, diminished ethics, questionable morality or cruelty. That's what this case comes down to. We don't need to have egregious sexual assault or sexual molestation. That is not the law. A teacher should know better than to touch girls, to continue a litany of these comments, to check them out, leering and making it clear to them that they are eye candy to him. His conduct was immoral and it's inconceivable that that behavior could have been excused by a warning. And that was why he was terminated. This behavior was irremediable. And I'll take questions. If any. Thank you. I didn't want to start the questioning when I wasn't sure if you were just taking a I didn't want you guys to give me the hook. That's hard to do from this distance, I'll tell you. All right. Justice Jorgensen, do you have any questions? Yeah. You're relying on harm, but it's harm to the students as well as the school's reputation, correct? Yep. Absolutely. It's harm to both of them. And we see that in how these girls, girl after girl, testified that it was strange. It was weird. It was odd. It made me feel uncomfortable. And then, of course, the damage to the school that was in all of those. Okay. Does this district have to present an expert? Nope. Harm to these girls? And if not, why not? There is authority that stands for the premise that our hearing officer found here, that where you have testimony from these teenage girls about the discomfort, the inappropriateness, the being strange, weird, and the nature of the conduct in and of itself is harm in and of itself. And that an expert does not have to be presented. For example, in the pain case, that was the teacher that was convicted of pot, had a pot condition. There was no expert, but the superintendent opined in that case that, you know what? We can't have this teacher back. He's now got a pot conviction. He can't be a role model to our students. We have that same thing here. We've got a 20-plus year superintendent who came up through the ranks at Chicago Public Schools, now is over at Waukegan, and she testified at length about the behavior that she didn't observe that was reported to her and the effect it had on these girls and how much resilience and how much it took for them to actually come to someone to report it with that fear of the adult factor hanging over their heads. There is certainly proof of damage to these girls without a psychologist testifying to it. You know, everything except the fact pattern in Hunt really boils down to a crime as well. Possession of pot is a crime. Endorsing a check and receiving the funds is a crime. Here, there was no crime. Well, I disagree. I mean, you know, physical contact with a girl that it was inappropriate and should not have happened, that is battery. Was he charged? No, he wasn't. Do I know why Waukegan Police Department chose not to pursue it? I don't. And by the way, those facts are not in the record. A police officer was not called here. But there were, I mean, we've got the police reports that Mr. Pasternak entered into evidence. Clearly, the police were involved. That's criminal battery. So your point is that conduct amounts to a crime and it is not a matter of whether it was charged, but whether the conduct is correct. That's not my position at all. The case law does not say in order to be immoral, it must be criminal. The Rolando case where the teacher used, you know, zaps people with a cattle prod and then wrote their names on a coward's list. Excuse me, counsel, wouldn't that also be a battery? Well, it would, but that was not how those cases were presented. That was simply a teacher that was going rogue. It was more than a corporal punishment case. Corporal punishment cases are typically considered remediable conduct. But in Rolando, that teacher took it up a notch and that behavior was cruel. And that's part of that same lingo out of the code that says a teacher can be terminated for irremediable conduct where it is negligent, cruel, immoral, or other sufficient cause. The statute doesn't add in the word criminal to that. So there's no requirement that cruel, negligent, immoral behavior also be criminal. Okay. Fair enough. I have no further questions. Thank you. You're welcome. Thank you. Thank you, Justice Jergensen. Justice Shostak, do you have any questions? Yes. Your opponent makes much to do about the notice. He basically does not dispute the facts, does not dispute the law. It just indicates that there was error in notice and that notice should have been given. I know your position is it was irremediable, the notice should not have been given. What if we find that it was not irremediable, then would notice have been required? If the behavior was remediable, yes, then the school code does say you have to give prior warning first. But that is not this case. And do you feel that the prior notice five years ago was sufficient to equal prior notice or it really didn't matter? Well, we introduced that evidence of the 2012 discussion between Dr. Levin and Mr. Pasternak to show that there had been discussions in counseling about the need to be aware of your spatial awareness with children. So that was a general counseling, bringing to mind the need, be careful with how you approach these students. Could be girls or boys. Watch how close you get to them. So that was relevant only in terms of he had been counseled. But we didn't. Some of the cases that you cite are quite old. I mean, they talk about, they're at a time when corporal punishment was allowed or when the good old days when a parent can give consent to the teacher to administer corporal punishment. Aren't those different than what we're dealing with today? Oh, absolutely. Absolutely. And I don't think the corporal discussion on this, because typically under Gillian and its progeny, corporal punishment cases and teaching performance are typically looked at, surprisingly, as remediable conduct. So that has to be subject to prior discipline. And I think the corporal punishment, I think that whole term is slowly giving way to what is proper discipline in the courtroom. And you're right. Some of these cases... Right. There is that in the courtroom too. Don't use a cattle prod on me, please. Let me see. I have one other thing. But I'm losing it now. Oh, I know. But we do have the corporal punishment cases that were consistent with the way things were done at that time. Are the behaviors or is this discipline, the facts of this case, consistent with the way that our country has gone at this point with respect to teaching and treatment of students? I'm sorry. I didn't understand the question. The treatment of students today, the way students are to be expected today, should that come into play just as the way that treatment of students back when you had corporal punishment were taken into consideration? In other words, does the pendulum kind of swing with the change in the way teachers are expected to treat students? I believe there is societal growth, if you will. But we don't have to stray too far from the statute that teachers are teaching character education. So the teacher is not only teaching English, but they are teaching qualities of respect and responsibility and fairness. That's in the school code and has been in the school code since 2005. So your interaction with both girls and boys, how you treat a girl demonstrates or how this man demonstrates that this is appropriate in how we treat women. This is how I'm going to say to a group of boys, hey, you know, join cross country, because what's better than seeing girls in short shorts? So it is not only what you are modeling to these girls, what is appropriate for a man to treat a woman, but you're also modeling the same thing to these boys. Well, look, treat them as sex objects. That is inappropriate. And that, as a society, we do need to grow and adapt. And our teachers are on the front lines of that. But is that enough to find it irremediable when you have a teacher who has been a good teacher for, what, 15 years? You need more for someone depending on the number of years they have been into the evidence. That concept that he was a good teacher for 15 years is not in this record. We as a school did not offer it because it was irrelevant in our opinion. And Mr. Pasternak rested. He did not put on a case. Had he wished his performance reviews and his entire school record to be in this record, he had that opportunity to do so. We have one teacher, Dr. Eric Levin, who attested to the fact that he had given him one performance evaluation and that his recollection was that it was proficient. So I do not want anyone, you know, making that giant assumption here that we've got this spectacular teacher when that's not in the record. That was his obligation to put that in the record, and he chose not to. So do we look at the fact that he was, you know, a 12-year teacher, 15, whatever it happens to be? The analysis of irremediable behavior really doesn't take that into account. The Hunt case that I mentioned earlier, the Argo v. Hunt, that was a case, I believe that teacher was a gym teacher for 17 years, and it was three girls who simply, well, I shouldn't say simply, who reported he stood close to us, he moved us close to us, and he pinched our butts. That was enough. The fact that he'd been a teacher for 17 years, that did not control the day. In fact, it didn't really even enter into the decision. His conduct was immoral. It was irremediable. I have nothing further. Thanks so much. Thank you. All right. Oh, I can't find my, there I am. Ms. Horace, didn't, well, the girls who testified generally, not every single one of them, but generally felt or said they felt that the conduct was not sexual. So how was that treated in the executive summary? I believe one of the girls did say, S.W., she said that the Pickle comment was kind of sexual, I think is how she said it in her teenage years. Did they use the word sexual? No, they didn't. But, you know, for 14, 15, 16-year-olds, did they need to use that, that it's also say that it doesn't have to be overtly sexual. This conduct is inappropriate if it's taken against a person because of their sex. And that's clearly the case here. The appellant was treating these girls this way because they were girls. And he felt that he could. He was the adult in the room, and he felt he could look these girls up and down and say, looking good. And, oh, you don't have to say that you're hot. We all know you're hot. And the litany of these comments go on and on. It wasn't limited to one track event or a week or a month. It was two track seasons. So the fact that these girls didn't say, you know, maybe we didn't find it a sexual come-on, I think that's not really key in the overall investigation that Sadara Devon and Lori Maccio took four weeks to do. Okay. There was also some testimony by some of the adults, almost as an aside, that they had experienced some spatial invasion, personal space invasion. But both the teachers or the adults and the girls testified that when that happened, generally they would move back and he would not move toward them. I think there was at least one who said he continued to move. But the fact that he didn't move forward, does that indicate that he recognized the problem, or did they handle that in any way in the executive summary? The spatial encroachment, both from the record point of view, the girls routinely experienced that. It was so commonplace. They talked about it amongst one another. And then we have the 14-year-old, I believe it was NP, who reported a very intimidating situation where she was telling Mr. Pasternak, I can't make it to track. And she was leaning against the doorframe with her leg stretched out. And he stood over her in a very intimidating way for 15 to 20 seconds questioning her commitment to track. So that's a highly threatening, intimidating position to take. And then in the executive summary with the supporting documents, I mean, there really should be considered one document. It's in there about his repeated violation of personal space by standing too close. I mean, when you look at this in total, and I believe that's how the court has to look at this, as the hearing officer and the board did, when you look at it in total, it was a violation of multiple board policies and how this man treated these girls, that there was a lack of respect. There was no appreciation for these girls as having their own individual worth. It was either sexual harassment and or just flat out discrimination treating these girls the way they were because they were girls. Okay, but the fact that my question really relates to the fact that with the exception of that one young woman who was standing in the door and there was that we'll call confrontation, most of the girls said that when he got too close, they moved back and he didn't move anymore. He stayed where he was. And I think there were a couple of teachers or coaches or administrators who also related that they had had conversations with him and they thought their personal space was invaded. But when they moved back, he stayed where he was. Isn't that an indication that, or isn't that some evidence that he understood and could maintain the distance? And so, you know, he took it on a person to person basis, as opposed to a general discrimination basis as is described in the book. I mean, he took each person separately. He stepped up, they stepped back, he stayed where they were with the exception of that one young woman. Right. I, to be a close talker, is that something that I'd want to see my male teachers do to a teenage girl? I think as a matter of practice, no. I do agree with you that in most cases, they stepped back and he didn't approach further. So I would agree with you there. But I don't think that it makes it right. And I also don't think that if we look at things in isolation, that that's the appropriate way to view this. This was just one more indicator of the level of behavior that these girls had to endure for at least two track seasons. All right. Thank you very much, Ms. Horace. I appreciate your Okay, and now we will move to Mr. Blunder. If you have any reply, you may do so at this time. Thank you, Senator. Just very briefly. Essentially, listening to what counsel is saying in response to the questions and in her argument, she's advocating that if you violate a school policy, it's essentially strict liability. And you're not entitled to a warning. It's by definition irremediable, even if the facts would suggest otherwise. That's essentially the position that they're taking in here, which is because he violated a policy or may have violated a policy. Therefore, they don't need to give a warning. The cases and I want to focus on the cases because counsel focused on the cases. She talked about Rolando, which was the corporal punishment case. First of all, that's a case pre-Gilliland and a lot changed in Gilliland. So it's a precursor. Also, she acknowledged that they're not relying on the corporal punishment cases, which Rolando is. The other cases they talked about pain. Again, criminal conviction. And there, there was no expert because you had a person convicted of a crime. And then they said, because they were teacher. Every case that they cited where there wasn't an expert involved someone who was convicted of a crime. Again, the second grader were pinched the butt. And in that case, there actually was expert testimony. McBroom, which they referenced was the second district case. In that case, it was a criminal conviction. Ahmad, again, a criminal conviction. So there's a line here in the question. It really comes back to where I started this, which is what power does the school board have or a school district to when they can terminate someone? And how does that interface with the protections of teacher tenure act and what limitations are there on that power? So again, I stand before you and I say here, Mr. Pastranek received professional capital punishment. He was terminated without having to be given a warning warning for conduct. It was that was remediable. Again, as the justice question evidence when he was standing too close and someone moved back, he respected the space and he did take people on an individual basis. We're handling this case pro bono. I've known Mr. Pastranek for 34 years, and he's not the immoral person he's being made out to be. We ask that you reverse the decision of the school board and reinstate him to his position. Thank you, counsel. Justice Jorgensen, do you have any questions? I do not. Thank you.  Yep. First of all, I am not going to consider counsel's personal opinion because it's not in the record. I appreciate the way you feel about your client, but I don't think that is appropriate and it's not in the record. I will not give that any weight in making this decision. The defendant put on no case at all. But yet you want to argue certain things that were never put into the record down below. Why is it that you didn't put on a case? I wasn't representing Mr. Pastranek at the administrative hearing, and I can't speak to what the legal strategy is. However, I reference the testimony, for example, of Dr. Levin, where he talked about, cited Common Law Record 719, that Mr. Pastranek was a proficient teacher and what that meant and some of the other aspects of this. And I think that you can find the points that we're making in the record itself. For example, counsel referenced the article in the Tribune and says, well, maybe it came from FOIA. Well, the Tribune article came within days, I believe it was two days after Mr. Pastranek was terminated at the board meeting. And if it came through FOIA, that would be a record for the district in terms of responding to a FOIA request. So I believe the sufficient facts are in the record to justify the finding that we're asking for. And again, I can't speak to what the strategy was at the administrative hearing. Okay. Also, do you have a case that says that there must be a criminal conviction in order to meet your burden as a plaintiff or a defendant in the case? I don't have a case that says that explicitly. However, all the cases that are out there, that's the fact pattern. Okay. Thank you. I have no further questions. Okay. Mr. Blonder, does proficiency as a teacher, I mean, does it stand alone as an evaluation or are there other issues that are considered in these evaluations? I don't understand your question, Your Honor. Well, you said that Dr. Levin found him to be a proficient teacher. He may have been a proficient teacher and that you say is in the record, but I hesitate to use this right now, but I can't think of a better word. Does that trump the fact that he also consistently engaged in this conduct for two track seasons? No, I'm not trying to suggest that one counterbalances the other. I'll avoid using the word trump and trying to answer that. I know. I couldn't think of another word. I appreciate that. But it's not that one takes precedence over the other. It goes to, we talk about totality, we talk about context. And again, the conduct was isolated to what happened in the track program. So we go to remediability. We look at it in context. Again, one way to remediate this was take him out of coaching track. So I think it just goes to the context of in his teaching, there was no issue that was ever raised in the 15 years. All right. But now that this issue has been raised and let's say that correction remediation was putting him just in the classroom, not on the track field. Isn't there going to be, I mean, it's a high school, it's full of kids and it's full of social media and it's full of things that we probably didn't have when we were going to high school. But isn't this reputation that he has going to get around? And could that not, in fact, or would that not, in fact, impact his proficiency as a teacher? No, I don't think it would. Again, that's entirely speculative. There's no testimony or basis in the record to suggest that, number one. Number two, under that logic, any time someone would make an allegation against someone, whether it was deemed founded or unfounded, they necessarily should be taken out of the classroom because people could Google it, people could find it, and the reputation could be at issue. Consider the situation where someone is arrested for drunk driving, who's a teacher. And let's assume that they're suspended temporarily while that happens and assume that they're acquitted after a trial. Under the logic that what could come around is because they're convicted of drunk driving, or I'm sorry, not convicted, charged with drunk driving, they must have been a drunk because that's what showed up on social media. You would never put that person back in the classroom. That's, I believe, the wrong standard and the wrong way to look at this. But in fact, some of those teachers have not been put back in the classroom because of the reputation then of the teaching institution that they're part of, correct? And the harm to it. The answer then would be he gets reinstated, he's put in an administrative role or a different role at the school. Well, I don't think most teachers would like to be a building superintendent as we know that term, correct? They may not like to be that, but that may be the result of the conduct as to the role that they can play or where they can be in the school system. Again, the issue here is, should he be terminated without having any recourse? If not, should he be in a classroom in front of the students? The question is, was the termination justified? Well, and when he had an opportunity, and I respect the fact that you were not counsel at that time, when he had the opportunity to counter this and say, hey, I understand, I can do this if you give me a chance, he chose not to do so, correct? The testimony is the testimony. And again, in hindsight, maybe he should have testified or a different defense. Hindsight is always 20-20. And that was the strategic decision that was made at that point in time. In hindsight, it was a bad strategic decision. Maybe. Maybe it would have made a difference. Maybe it wouldn't have. But that's irrelevant to based on the record, whether or not the conduct was remediable or not. Okay, thank you very much, counsel. Do either of my colleagues have any questions based upon the ones I asked and the answers I received? Justice Jorgensen? I do not. Thank you. Justice Shostak? No. Okay. Well, counsel, thank you very much for your presence here today. And we do appreciate the quality of the argument. One of you must be on the porch or in a wind tunnel. I'm 10. But we will make a decision in due course. And we will now stand adjourned. Thank you very much, counsel. Thank you. Thanks, everyone. Be well.